UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROBERT EARL DAVIS,

    Petitioner,

v.                                             Case No: 2:18-cv-260-SPC-MRM

SECRETARY, DOC,

    Respondents.
_____/

# OPINION AND ORDER[1]

Before the Court is Petitioner Robert Earl Davis's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1).

## Background

The State of Florida charged Davis with shooting Jarvis Martin after a fight in a nightclub. On September 14, 2006, a jury found Davis guilty of attempted second degree murder and of shooting at, within, or into a dwelling or building. (Doc. 8-2 at 52-53). The trial court sentenced Davis to a 25-year prison term. (Doc. 8-2 at 94). The Second District Court of Appeal of Florida (2nd DCA) affirmed. (Doc. 8-3 at 468). Davis filed four unsuccessful

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

postconviction motions in state court. The Petition filed here mirrors his latest state postconviction motion.

In the Petition, Davis claims that newly discovered eyewitness testimony from a fellow inmate named Anthony Young exonerates him. He presented this claim to the postconviction state court on June 29, 2015. (Doc. 8-5 at 262). After holding a hearing, the postconviction court summarized the evidence as follows:

> 5. At the hearing, Mr. Young testified that he had met Defendant for the first time at Moore Haven prison. He explained that he was the cousin of Robert Chapman, who was also present at the club, and who had been part of an altercation which preceded the shooting of victim Jarvis Martin. That altercation had been between Robert Chapman and Grady Love, Defendant's cousin and co-defendant. Mr. Young testified at the hearing that Defendant was not the shooter, and that the shooter was a Spanish man. He also explained that he had allowed so much time to pass before coming forward because he had been scared of retaliation, but now did so because it was the right thing to do. When asked if he is currently Defendant's prison roommate, Mr. Young admitted that he was, but explained that they had not been roommates at the time that he wrote his affidavit and that the fact of their sharing a room is not something either one of them can control. Mr. Young also testified that the club had been dimly lit and that he is blind in one eye, but despite these limitations, be had been able to see the shooter and was positive that Defendant had not been that person.

> 6. Defendant testified at the hearing that he had met Mr. Young in prison, shortly after arrival in March of 2015. He explained that they had met on the "rec yard," where the inmates congregated by hometown, and where they were introduced to each other based on their both having lived in Fort Myers. Defendant stated that as part of the general discussion, Mr. Young realized that Defendant was the person who had been charged with the club shooting and

> volunteered the information that he, Mr. Young, had seen the shooter. Defendant testified that he and his cousin, Grady Love, had gone to the club together, and Defendant's cousin had gotten into an altercation with Mr. Young's cousin, Robert Chapman, before the shooting. He explained that due to the sheer number of people in the club, many of whom he did not know, he had no way of knowing about Mr. Young's potential testimony until he spoke with him in the prison yard at Moore Haven in 2015. He also stated that he had asked Mr. Young why Mr. Young had not come forward sooner, to which Mr. Young had only replied that he had been scared.
>
> 7. However, on cross-examination, Defendant was asked about a March 21, 20015 [sic] statement he had made to police, in which he claimed that both he and the co-defendant had guns during the incident. Defendant admitted at the evidentiary hearing that the March 21, 20015 [sic] statement had been untruthful, but when asked to explain why he had lied under oath, he had not been able to give an answer. Defendant also admitted that a plea offer had been negotiated, but that it did not go through because the State had learned that Defendant's statement had been false. Defendant also stated that he had not testified at trial.
>
> 8. Hamid Hunter, the Assistant State Attorney who prosecuted Defendant's case, testified that a plea agreement had been signed by the parties, but that the State had receded from the agreement because the State had noticed elements in the Defendant's statement that were inconsistent with other evidence and the testimony of other witnesses. Where the evidence and the other witnesses tended to be consistent, Defendant's statement tended to be inconsistent with both. Consequently, the State no longer believed Defendant.

(Doc. 8-6 at 64-65). The postconviction court weighed this evidence against the

following evidence from the record:

> 11. At trial, the record reflects that the defense did not mount a defense of its own, but rather challenged the State's case by cross-examining the State's witnesses, attacking their credibility by impeachment, and arguing to the jury that the victim and his

3

family members were motivated to accuse Defendant of the crime as a result of a family grudge they held against him for his having beat up one of the victim's younger cousins. Defense counsel also pointed out to the jury that some of the State's witnesses had prior felony convictions, including the victim and his sister, and that some of the prior felonies had been for crimes of dishonesty.

12. Trial testimony established that the club had been dimly lit; that two people, who the State's witnesses identified as Defendant and his co-defendant, ran out of the club only to return with guns; and that Defendant shot the victim in the chest. Trial testimony also revealed that there was a fight was [sic] between Mr. Chapman and the co-defendant just before the shooting, and was arguably the cause of the shooting. The witnesses testified that the club was crowded, with approximately 500 to 600 people present. Most of the witnesses said that although the lighting had been dim, they had been able to distinguish the features of other people across the dance floor, although some stated that it had been too dark for them to do so. One of those who testified that it had been too dark to see across the dance floor did, however, state that if the lighting and angles had been right, people would have been able to distinguish the features of others. Only the victim claimed that the club had turned on the lights after the fight that had served as the catalyst for the shooting. However, given that the crime scene technician had testified at the trial that the club remained dimly lit even with the club lights on a full power, this statement from the victim does not appear to be as contradictory as it would otherwise seem to have been.

13. As mentioned above, there was trial testimony that Defendant had a gun. Specifically, many witnesses testified that it had been silver.

14. Concerning these witnesses, and those who identified Defendant as having run into the club with a gun or having shot the victim, trial testimony reflects that trial counsel brought out on cross-examination, as it pertained to each witness, their close relationships to the victim, their prior prison record as a suggestion of their lack of credibility, questioned their motives for having delayed as long as they had before going to the police, or impeached them with contradictory inconsistent statements.

> 15. The most notable of these for our purposes was the cross-examination of the bouncer who positively identified Defendant and co-defendant in open court at trial as the two people he had seen running past him from outside the club and back inside with guns, but who had told the police in a prior statement that one of the two men was a tall Hispanic man, who was definitely not black. As both Defendant and his co-defendant are black males, the witness was questioned whether and how he could identify Defendant as the taller of those two men. His answer was simply to re-identify Defendant as the person he had seen, despite the earlier description he had given. This is notable, because at the evidentiary hearing, postconviction counsel argues that Mr. Young's testimony supported this testimony of a tall Hispanic shooter.

(Doc. 8-6 at 65-67) (citations omitted). The postconviction court considered the credibility of West and Young and weighed their testimony against the trial evidence. It found "that Mr. Young's testimony does not weaken the case against the defendant so as to give rise to a reasonable doubt as to Defendant's culpability" and denied West's motion. (Doc. 8-6 at 67-68). West appealed, and the 2nd DCA affirmed without a written opinion. (Doc. 8-6 at 237).

Davis's Petition followed. Respondent concedes Davis timely filed the Petition and exhausted all state law remedies.

## Applicable Habeas Law

The Antiterrorism Effective Death Penalty Act (AEDPA) governs a state prisoner's petition for habeas corpus relief. 28 U.S.C. § 2254. Relief may only

5

be granted on a claim adjudicated on the merits in state court if the adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). A state court's violation of state law is not enough to show that a petitioner is in custody in violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 134 S. Ct. at 1702; *Casey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when

faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent it the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 529 U.S. at 406). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "[T]his standard is difficult to meet because it was meant to be." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018).

Finally, when reviewing a claim under 28 U.S.C. § 2254(d), a federal court must remember that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not unreasonable merely because the

7

federal habeas court would have reached a different conclusion in the first instance.").

## Analysis

To start, Davis's claim that Young's testimony exonerates him is not itself a proper ground for federal habeas relief. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). This is so because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Id.* It is not this Court's "role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial." *Raulerson v. Warden*, 928 F.3d 987, 1004 (11th Cir. 2019) (quoting *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002)).

Davis claims the state court "overlooked the new evidence" that he can now use to "refute the testimony of the original state witnesses." (Doc. 1 at 7). That is demonstrably untrue. The postconviction court heard and evaluated Young's testimony, weighed it against the evidence presented at trial, and determined that it did not create a reasonable doubt as to Davis's guilt. Davis does not identify any constitutional errors in the postconviction court's denial of his claim, and this Court finds none.

Davis also uses Young's testimony as a springboard to a *Giglio* claim. A *Giglio* error occurs when "undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *Ventura v. Attorney Gen., Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). "In order to prevail on a *Giglio* claim, a petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." *Id.* at 1277 (quoting *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999)).

Davis fails to show *Giglio* error. He does not identify any perjured testimony from trial. Instead, he makes the conclusory claim that prosecution witnesses "conspired to accuse, convict, and otherwise imprison" him—a rehash of his argument at trial. (Doc. 1 at 7). But Young's testimony, while inconsistent with trial testimony identifying Davis as the shooter, does not prove the prosecution used perjured testimony at trial. And it certainly does not prove that the prosecutor was aware of any false testimony. Davis has not shown entitlement to habeas relief.

## DENIAL OF CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather,

9

a district court must first issue a certificate of appealability (COA).  "A [COA] may issue…only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003) (citations omitted).  Davis has not made the requisite showing here and may not have a certificate of appealability on any ground of his Petition.

Accordingly, it is now

**ORDERED:**

Petitioner Robert Earl Davis's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) is **DENIED**.  The Clerk of the Court is **ORDERED** to terminate any pending motions, enter judgment, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on March 23, 2021.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

SA: FTMP-1
Copies:  All Parties of Record